JOHN OATMAN, by Next Friend, G. W. OATMAN, v. ST. LOUIS-SOUTHWESTERN RAILWAY COMPANY, Appellant.

Division Two, June 5, 1924.

1. **NEGLIGENCE: Volunteer: Licensee: Humanitarian Rule.** Where the plaintiff, at the time he was jostled or fell from a switching freight train and his feet crushed, was not an employee of the railroad company, and at most was in no more favorable relation to the company than that of a mere volunteer or a licensee trying, with the consent of brakemen, who had no authority to employ him or give their consent, to gain experience in switching in order that he might obtain employment upon another railroad, and there are no facts connected with his injury calling for the application of the humanitarian rule, he cannot recover damages for his injuries from the railroad company.

2. ————: ————: **Duty of Company.** A person who works for another of his own volition, without the knowledge or request of any one in authority, cannot thereby establish the relation of employer and employee, so as to base a claim for damages on the duty that an employer owes to an employee, but is a volunteer; and a mere volunteer, whose assistance is not called for by the necessities of the situation, but gives it for his own benefit, can recover for his injuries received while rendering such assistance only when the person receiving it negligently failed to exercise ordinary care to avoid injuring him after his peril was discovered or might reasonably have been discovered.

Headnote 1: Master and Servant, 26 Cyc. 1086. Headnote 2: Master and Servant, 26 Cyc. 1085, 1086.

Appeal from Dunklin Circuit Court.—*Hon. W. S. C. Walker*, Judge.

REVERSED.

*John R. Turney, A. H. Kiskaddon* and *Wammack & Wellborn* for appellant.

(1)   Plaintiff at the time and place of his injury was a trespasser or a mere volunteer or bare licensee to whom the defendant owed no duty except to not wantonly or wilfully injure him.   Hall v. Railroad, 219 Mo. 586; Chaney v. Ry. Co., 176 Mo. 603; Wencker v. Ry. Co., 169 Mo. 592; Shaffer v. Ry. Co., 201 Mo. App. 116; Hunter v. Corrigan, 43 L. R. A. (N. S.) 187; Shea v. Gurney, 163 Mass. 184, 47 Am. St. 446; Marshall & East Texas Ry. Co. v. Siram, 153 S. W. 404; Mickelson v. New East Tintic Ry. Co., 23 Utah, 22; Wagen v. Minneapolis & St. Paul Ry., 80 Minn. 95; Goshen Furnace Co. v. Talley's Adm., 114 S. E. (Va.) 728; 20 Cyc. 1085; 4 Labatt's Master & Servant (2 Ed.) secs. 1561, 1562; Thompson on Negligence, sec. 4680; 4 Elliott on Railroads (3 Ed.) sec. 1872; 1 White on Personal Injuries on Railroads, sec. 223.   (2)   Plaintiff was in no sense in the employment of the defendant.   There was no relation existing between plaintiff and the defendant characteristic of the relation between a servant and his employer such as selection and engagement of the servant, the payment of wages, the power of dismissal, and the control of the servant's actions.   Robinson v. Baltimore & Ohio Ry. Co., 237 U. S. 93; Morgan v. Bowman, 22 Mo. 548.   (3)   The testimony fails to show that any agent of defendant who had authority to employ persons to work for defendant had any knowledge that plaintiff had been assisting defendant's train crew in switching or making up defendant's local freight train in the yards at Malden, even if plaintiff had been doing this. From such testimony as plaintiff offered on this point it would be a mere conjecture as to whether or not any such agents of defendant had this knowledge, and defendant's division superintendent, the only agent of the defendant with authority to employ servants, pointedly denies that he had any such knowledge.   Plaintiff must bring his case out of the realm of mere conjecture.   Giles v. Railroad, 169 Mo. App. 34; Orris v. Rock Island Ry. Co., 279 Mo. 30; Glick v. Ry. Co., 57 Mo. App. 97; Hall v. Railway, 219 Mo. 588.   (4)   Even had defendant had knowledge that plaintiff was assisting its train crew, this would not have changed the status of the plaintiff from

that of a mere volunteer or a trespasser. Grissom's Adm. v. Atlanta & Birmingham Air Line Ry., 13 L. R. A. (N. S.) 564; Giles v. Railway, 169 Mo. App. 24; Mickelson v. New East Tintic Ry. Co., 23 Utah, 42; Wagen v. Minneapolis & St. Paul Ry., 80 Minn. 93; R. S. 1919, sec. 3662; Barney v. Railway, 126 Mo. 372.

*T. R. R. Ely* and *George Smith* for respondent.

Plaintiff was an invitee or a licensee with an interest, and his relations were such with the defendant in this case that they bore the relation of master and servant. Etchison v. Lusk, 195 Mo. App. 185; Ryan v. Boiler Works, 68 Mo. App. 148; Schaffer v. Ry. Co., 208 S. W. 145; Atchison, Topeka & S. Fe Ry. Co. v. Fronk, 11 Am. & Eng. Ann. Cases, p. 174; Eason v. Ry. Co., 65 Tex. 557, 57 Am. Rep. 606; Moore v. Wabash, 84 Mo. 481, 487; Lowenstein v. Mo. Pac. Ry. Co. 134 Mo. App. 34.

RAILEY, C.—On January 5, 1922, John Oatman, a minor, nineteen years of age, acting through his father, G. W. Oatman, as next friend, filed in the Circuit Court of Dunklin County, Missouri, an action to recover damages for personal injuries sustained by said minor through the alleged negligence of defendant.

The case was tried upon an amended petition, which alleges, in substance, that defendant, a Missouri corporation, owned and operated a line of railroad running from St. Louis, Missouri, to and through the city of Malden, in said county, and extending into the State of Arkansas; that several switches were connected with its main line of railway in said city of Malden over which freight and passenger trains were operated for hire; that on November 8, 1921, and prior thereto, plaintiff was invited and licensed by the servants and employees of defendant's local freight train and the switchyards in said city of Malden to assist said servants and employees in operating said train and doing switching in said yard and, as such licensee and invitee, was at the above-mentioned

time under the control of defendant, its servants and employees, and at the time of his injury was carrying out the orders of said defendant and its servants; that the local freight train engaged in said switching was numbered 57, and was operated from Malden to Jonesboro, Arkansas, upon every other day; that plaintiff, for a period of about two months before his injury, had been invited and licensed by defendant aforesaid in making up said train and carrying out the orders of defendant and said servants; that the division superintendent, the local station agent, the conductor, fireman and brakemen on said freight train No. 57, during all of said two months preceding plaintiff's injury, knew that plaintiff was assisting in switching and making up said local freight train every other morning in said city of Malden; that on November 8, 1921, said train was operated by the same crew which had been operating it for two months prior to said date; that on said November 8, 1921, while plaintiff was engaged with said crew in making up local freight train No. 57, which was to run on said date from Malden to Jonesboro aforesaid, he was directed by defendant's servants and employees to uncouple a certain box car, attached to said train in Malden, being the fifth and last car from the engine, which said car was being pushed from the west, and from the main track, onto a switch track, designated by said servants and employees, who directed plaintiff to uncouple said car while said train was in motion, so that the car which was to be uncoupled might be kicked onto one of defendant's side tracks; that said car which was to be uncoupled was a bad-order car which had a penalty defect, on account of the absence of a chain lifter, which is necessary to operate the coupler lock with safety; that the defective condition of said car was known to defendant and its servants, or by the use of ordinary care they could have known its condition; that said car had been operated in plain violation of the interstate commerce laws, regulating the operation of such cars; that in order to uncouple said car it was necessary for plaintiff to climb upon the ladder attached to the end of the car immediately

in front of the car to be uncoupled and kicked in on the side track, and to hold said ladder with one hand, and pull the pin that uncouples the car with the other; that while standing upon and holding the ladder on the end of the car aforesaid, and while in the exercise of due care on his part in performing said duty, the servants and employees of defendant carelessly and negligently, while said cars were being moved at a great rate of speed, applied to the brakes of said train such great force of air as to cause said train to stop suddenly, and with such unusual, unnecessary and terrific force and so quickly, as to break plaintiff's hold on the ladder and throw him from said box car onto the iron railing and track over which cars were being run, and immediately in front of the car upon which he had been standing and holding; that he fell between said cars and his right foot became wedged between the iron rails of the passing track, which said passing track runs parallel with the main track for a long distance, and the iron rails of the switch track at a point about ten feet from the switch point, connecting the switch track and said passing track; that at the point where plaintiff's right foot was caught there was nothing between said rails to prevent his foot from being caught therein; that plaintiff was unable to extricate himself and, while in that position, the wheels of the train passed over the feet of plaintiff and both legs were cut off below the knees. After describing plaintiff's injuries, etc., the amended petition further alleges that, by reason of the carelessness and negligence of defendant and its servants, in furnishing him a defective car; in throwing him off said car by said sudden unusual, unnecessary and terrific jerk that broke his hold as aforesaid; and in permitting said switch to remain unblocked as aforesaid, he was rendered a cripple for life, and asked for damages, on account of his injuries, in the sum of $50,000.

Defendant, in its answer to said amended petition, admitted its incorporation, and ownership of said road. It denied every other allegation contained in said petition.

It appears from the evidence that on and prior to November 8, 1921, the defendant owned and operated a line of railroad from St. Louis, Missouri, running through the town of Malden in said State to, and beyond the town of Jonesboro, Arkansas. The defendant's road is commonly called the "Cotton Belt." Its tracks at Malden are crossed by the tracks of the St. Louis & San Francisco Railroad, often called the "Frisco." Malden is a city of about 2500 inhabitants, and defendant's road runs through the same in a southwesterly and northeasterly direction. The defendant maintained · at Malden a main track, a passing track, two switch tracks and a melon track. The passing track was parallel with the main track. Switch track No. 2, as designated on the plat offered in evidence, was on the south side and next to the passing track. Switch track No. 1 was still further south and next to track No. 2, while the melon track was south of track No. 1.

On the 8th of November, 1921, and long prior thereto, the defendant had been operating a local freight train, which was made up at Malden and ran every other day from the latter place to Jonesboro, Arkansas, and return. The local freight train was operated with a full crew of employees, composed of an engineer, fireman, conductor and three brakemen. It was so operated on November 8, 1921, and for a long time prior thereto. O. R. Deitrich was the conductor, and E. A. Rogers, J. A. McHaney and W. M. Innes were the regular brakemen operating said train on and prior to November 8, 1921. The local train above mentioned, was called No. 57, and described by the witnesses in this way. The larger portion of Malden, including the business section, lies north of the defendant's tracks, although there are quite a number of residences on the south side of said track, including the village of Spoonerville, which adjoined Malden, and where the plaintiff lived. On the west edge of Malden the tracks of the Frisco, running north and south, cross defendant's tracks at right angles. The defendant's tracks extend up into the north yards, it is about ninety yards from the

Frisco crossing to the first switch connecting the passing track and main track. It was about seventy yards from the switch connecting the main and passing track to the switch at which plaintiff was hurt, it being the switch leading to the three south side tracks. The coal chute was about 600 feet from where plaintiff was hurt. Defendant's depot is still farther northeast.

About eight o'clock on the morning of November 8, 1921, the conductor testified that the bad-order car was in the yard at Malden, and that on account of its defective condition he had it put on the *repair* track, so it could be repaired. This car was being placed on the track for repairs, at the time plaintiff was injured.

George Oatman, the next friend and father of plaintiff, testified that he lived at Malden, and had been car-repairer for defendant for twelve or thirteen years; that the bad-order car had a broken pin chain, which was a penalty defect; that it should have been placed in the rip track for repair; that when this car was on the main line it should have been kicked on to the bad-order track, which was about 200 feet from where the accident occurred.

Plaintiff testified that in 1918 he worked for the defendant from five o'clock at night until two o'clock in the morning, wiping engines and putting oil in them; that this was his regular job; that he performed the same service in 1919; that he went to doing emergency firing on the 3rd of March, 1920; that is, he took some man's place if the latter was sick. He testified: "I kept the job, wiping engines and emergency fireman until March, 1921, then I was discharged;" that he quit work for defendant March 16, 1921.

Plaintiff further testified as follows:

"I didn't stand around the yards watching the trainmen. I helped the boys what time I was around there. They never asked me to help them, just come plain out, only they give me signals; they never did talk to us.

"Q. You just understood they wanted you to help them? A. Yes, sir; they often told me if I would help them they would help me get a job."

Plaintiff testified that, on the morning of November 8, 1921, and prior thereto, he had been helping this crew every other morning "for the last two weeks;" that he was getting no pay for this work; that he had not signed any application for a job, and was not expecting any pay; that he had no particular hours to stay there; that the crew were already at work when he got to the yards on the morning of his injury; that he was standing between the main line and passing track; crossed over the track and saw McHaney, the head man; that the latter was standing up in about twenty feet of the main line frog, between the main line and passing track; that he was in about twenty feet of McHaney; that Innes, the swing brakeman, who had charge of the switching, was standing between the main line tracks; that he was north of plaintiff and more than ten feet ahead of him; that he just spoke to Innes and McHaney, "and that was all that was said."

Plaintiff testified that Innes gave the signal to Mc-Haney, and the latter gave it to him; that Innes handled the switch list; that he was "not positive that Innes gave the signals to McHaney"; that McHaney gave him (plaintiff) the signal to get on the car. Plaintiff gave it as his opinion that the cars were moving about twelve miles per hour when he got on; that this was not fast, and any train man ought to catch it while traveling thirty-five miles per hour; that he caught the car and cut it off; that he discovered the pin lifter was broken when he got hold of it; that he crossed over and uncoupled the car from the other side. He then described what occurred as follows:

"They suddenly stopped the train. That's the way they make a kick, but there was no use to run so fast. The chain brakes were set on the train. I knew they were going to kick this car back there. That was the signal I received. I knew that they would have to stop this engine, and had a pretty good hold. My foot didn't slip. I had a good hold. My hand-hold broke with me. My right hand broke loose.

"The sudden stop made by hand-hold slip, and that threw me down;" that in jumping he fell with his feet between ties and rail; that the car cut off both legs below the knee. Plaintiff testified that the crew in doing this switching, were in a hurry to get in the clear of number four.

He further testified:

"Mr. Innes was the brakeman that gave me the signal; he goes and lines the main line switch for number four. The engine was on the main line, headed south, and they were backing north with these cars."

He said that he was standing on the end ladder of a foreign box car, and was attempting to do the uncoupling in that way; that "this was the first time I had ridden on that end ladder to make an uncoupling; of course, it is often done. I had seen it done lots of times in a case of a bad car."

Over the objection of defendant plaintiff was permitted to testify, that: "I was helping the boys in order to get experience to hire out to the Mountain." He said the boys knew that.

Some other testimony was offered in behalf of plaintiff tending to show that the train was running fast when plaintiff was hurt, and that he had been assisting the train crew in making up trains at Malden for some time before the accident.

Over the objection of defendant, plaintiff was permitted to testify as follows:

"Q. Who, of the train men and railroad employees, saw you during the two months you were assisting in making up the train that runs from Malden, Missouri, to Jonesboro, Arkansas? . . .

"A. Mr. Bowker, the assistant superintendent, and C. O. Benson, he is the depot agent, and also Deitrich, the conductor on the south-bound local train No. 57."

D. W. Bowker, assistant superintendent of defendant, testified as follows:

"I am assistant superintendent for the St. Louis Southwestern Railway Company. I have had that posi-

tion since April 1, 1920. I occupied that position between
the 8th day of November, 1921, and for two months prior
to that time. *I do not know John Oatman.* Prior to the
injury I did not have any knowledge that Mr. Oatman
was ever engaged in helping the train crew of local num-
ber fifty-seven do switching or making up the train in
Malden yard.

"Q. Did you ever see him assisting the train crew in
that way? A. I did not. . . .

"I'm in and out of Malden on an average of about
once a week. When I am there I look after the company's
business in every respect. *I employ the trainmen.* The
trainmen that worked on this number fifty-seven local
were employed before my time. During these two months
prior to November 8, 1921, I would have had authority to
have employed the trainmen, if necessary. The conduc-
tor, the brakeman nor the station agent, had any authority
whatever to employ anyone. The train crew consisted of
the conductor and three brakemen, engineer and fireman,
at that time. I was not there on the morning John Oat-
man was injured."

Witness said it would have been impossible to operate
the switch where plaintiff's foot caught, if it had been
blocked, etc.

C. O. Benson, defendant's station agent at Malden,
testified as follows:

"I was there for the two months before November
8, 1921. During those two months I had no knowledge
that this man Oatman was assisting the train crew in
switching or making up trains there in the Malden yards.
I have known John Oatman about seven years. I have
not seen John Oatman for a period of two months prior
to November 8, 1921, or at any time since he quit work-
ing for the company, assisting in switching or making
up trains in the yards at all. I had no knowledge that he
was doing that. I have no authority to employ men to
work in the switching service. I have no authority to let a
boy come there and work with the train crew in order to
learn the trade of being a trainman."

O. R. Deitrich, defendant's conductor in charge of local freight train No. 57, on the 8th of November, 1921, testified as follows:

"I don't know John Oatman. . . . In the period of two months before November 8, 1921, nobody assisted my crew in switching in that yard. Three brakemen and myself did the switching and made up the trains. I ran that crew one year and a half and prior to this time John Oatman nor any one who might have been John Oatman, nor anybody did any work there solicited or unsolicited.

"I had no knowledge whatever for the period of two months before November 8, 1921, that John Oatman or anybody else that might have been John Oatman was switching or helping these trainmen with this train, coupling and uncoupling cars. I had never warned John Oatman to stay off of those cars because I never knew he was on them. The assistant superintendent hires these trainmen; the office is located at Illmo, Missouri. I have no authority to hire trainmen or persons to assist in switching or working in the yards. I have no authority to let them assist in order to train them to make brakemen or switchmen except by written instructions from the superintendent."

E. A. Rogers, a brakeman of defendant, testified that the cars were running about six miles per hour when plaintiff was hurt. He further testified:

"I had been one of the crew making up that train preparatory to leaving the Malden yards every time it left for the two months prior to November 8, 1921. I know John Oatman. I had never asked him to assist in switching or making up that train. I didn't know anything about any arrangement for him to help the boys, to learn switching so that he could work on the Iron Mountain. If he was assisting in switching or making up trains there during that time I didn't know anything about it. I have never seen him assisting in any switching there. I saw the stop the train made there at that time. I think it was just an ordinary stop; we consider it an ordinary stop while switching cars."

Witness further testified that if he had seen plaintiff assisting in making up said local train, it would have been his duty to instruct him to get off said car. After the accident, witness said Innes asked plaintiff what made him do that, and plaintiff said: "I don't know; that's what a fellow gets for being where he has got no business."

J. A. McHaney, defendant's brakeman on train No. 57, said he saw plaintiff on the morning of November 8, 1921. He further testified: "I hadn't seen John Oatman around there at all assisting that train crew in making up that train for two months before that. I have no knowledge of his having done anything of that kind. I had never given him any signal to do anything at that time and place. I have never seen any of the other boys do that. I knew John Oatman at that time." He further testified: "It is my duty to keep men that were not in the employ of the train off of the train. I have instructions to that effect, and the rules of the company require me to do it. I didn't tell Oatman to get off because he wasn't on. No, sir, I didn't know that he was going to get on."

W. M. Innes, the third brakeman of defendant on said train, testified that they were taking the bad-order car to have it placed on track No. 1 to be repaired. He further testified:

"I had given Brakeman Rogers the signal to drop off and line up number one switch. I mean line it up so that we could shove the car back into number one. After I dropped off there and the train stopped, I didn't give any signals; when the cars passed by, Brakeman McHaney hollered to me and says, 'This car is bad order'. and I says, 'Yes I know it, we're going to shove it on number one track and leave it' and I stepped over and lined up the passing track switch. That is the switch where Oatman got hurt. When I came back on the right hand side they were backing up and as I came back on the right hand side, the engineer's side, I noticed someone go between the cars. He went between the rear car

and the second car. Just as I seen him he went in between those cars. I gave the engineer a stop signal. I intended to make him get off of there. He was in danger of getting hurt. Those cars would have shoved together and mashed him in between them; being a bad order it was very dangerous to be between those cars. I was afraid that the draw bar would fall out, or maybe shove back and crush him.

"I gave just an ordinary stop signal. I have observed the speed of cars running on tracks and I think I can tell fairly well at what speed we are running. In my judgment we were running about five miles an hour at the time. We made just an ordinary stop."

Witness further testified:

"I had been working there continuously with that crew when they were at Malden for two months prior to November 8, 1921. I know John Oatman. John Oatman has not been assisting in switching and making up trains down there during that period of time. I have no information of any agreement by which he was to do switching there and assist the boys and learn the trade so that he could get a job with the Iron Mountain. I never heard anything like that until yesterday.

"The conductor is primarily in charge of that train. The swing man is the man that gives the signals to do the switching; that is myself."

Witness testified that after the accident plaintiff said in his presence and while Rogers was there, that: "This is what I get for fooling around where I haven't got any business."

Witness said he had not given any signal to plaintiff to do any switching, or to uncouple cars.

Such other matters as may be deemed important will be considered later.

The jury returned a verdict in favor of plaintiff for $15,000 and judgment was entered accordingly. Defendant, in due time, filed motions for a new trial and in arrest of judgment. Both motions were overruled, and an appeal was allowed defendant to this court.

I.  Appellant, through its counsel at the trial of the case, objected to the introduction of any evidence, on the ground that the amended petition failed to state facts sufficient to constitute a cause of action against defendant.  The sufficiency of the petition to state a cause of action was again challenged by appellant in its motion in arrest of judgment, and is now challenged in this court.  Counsel for defendant, at the conclusion of plaintiff's evidence, and at the conclusion of the whole case, offered demurrers to the testimony on the ground that plaintiff had failed to make a case for the jury.  The defendant still insists that its demurrer to the evidence at the conclusion of the whole case, should have been sustained, and that by reason thereof the case should be reversed without remanding.  There is no controversy over the amount of damages awarded by the jury, if the case was correctly tried, and plaintiff was entitled to go to the jury on the merits of the controversy.  In view of appellant's contention that plaintiff was not entitled to have his cause submitted to the jury, we have made a careful analysis of the amended petition, and have set out with great particularity all of the testimony relating to plaintiff's alleged employment, and the defendant's alleged negligence.

*Liability.*

Without the slightest hesitation, we have reached the conclusion from the undisputed facts that none of the train crew in charge of the local freight train No. 57 had any authority whatever to employ plaintiff to assist in switching and making up said train at Malden on the morning of November 8, 1921, when plaintiff sustained the injuries complained of in petition.  Giving to plaintiff's evidence a latitudinous construction, and conceding to him every favorable inference which a fair-minded jury of reasonable intelligence could properly draw therefrom, it clearly appears that he was not, at the time and place of his injury, an employee of defendant, and occupied no more favorable position than that of a volunteer, licensee or trespasser; and in the absence of any facts herein calling for the application of the hu-

manitarian rule, there can be no recovery against the defendant. The foregoing principles of law, applied to the facts before us, are sustained by practically all the leading text-books, and by an unbroken line of authorities in this State, some of which are as follows: 4 Elliott on Railroads (3 Ed.) sec. 1872, and cases cited; 18 R. C. L. sec. 84, pp. 578-9; and numerous cases cited; 4 Thompson on Negligence, sec. 4680; 4 Labatt's Master & Servant (2 Ed.) secs. 1561-2; 1 Bailey on Personal Injuries (2 Ed.) sec. 31, p. 81; 26 Cyc. 1085; Snyder v. Railroad, 60 Mo. 413; Sherman v. Railroad, 72 Mo. l. c. 65-6; Stringer v. Ry. Co., 96 Mo. l. c. 302; Feeback v. Ry. Co., 167 Mo. 206; Milton v. Railroad, 193 Mo. l. c. 57; O'Donnell v. Railroad, 197 Mo. l. c. 118; Hall v. Railroad, 219 Mo. 553; Forsythe v. Grocery Co., 283 Mo. 49; Youmans v. Railroad, 143 Mo. App. 393; Shaffer v. Ry. Co., 201 Mo. App. 107, 208 S. W. 145.

The law in respect to foregoing subject is stated with marked ability in 4 Elliott on Railroads (3 Ed.) 1872, as follows:

"A person cannot make himself the employee of a railroad company by his own act, for the relation of master and servant cannot exist in such a sense as to create the duty of employer to employee without the express or implied assent of both parties. No one can intrude himself into the service of another person independently of the latter person's consent or acquiescence. It follows from this that one who without any employment, or any request, express or implied, from a railroad company assumes to enter the service of the company cannot create the relation of master and servant. If that relation does not exist one who assumes to perform service for the company must be regarded as a mere volunteer without any right whatever to insist that the company owes him a duty as master or employer. Duty cannot exist where there is no relation between the parties creating it. The overwhelming weight of authority sustains the doctrine that a volunteer cannot charge a railroad company with the duty of an employer. If there

is authority to employ the persons who undertake to render service then the general rule will not apply. Ordinarily, trainmen have no authority to employ servants for the company."

Many authorities are cited in support of above quotation.

In 18 Ruling Case Law, sec. 84, pp. 578-9, the law on this subject is stated clearly and forcefully as follows:

"While there is a scattering of cases that do not adhere strictly to the rule, it is held by the great weight of authority that a person who works for another of his own volition, without the knowledge or request of anyone in authority, cannot thereby establish the relation of employer and employee, so as to base a claim for damages on the duty that an employer owes to an employee. The fact that the injured person engaged in the work at the request of an employee does not take his case out of the rule. If the employee was without authority to bind the employer by the arrangement, the assistant is still no more than a volunteer. Nor is the rule varied by the mere fact that the employer knows of and consents to the arrangement."

In 4 Thompson on Negligence, sec. 4680, the law of the case is stated as follows:

"A person who volunteers to assist the servant of another, without being employed so to do by that other, is deemed to assume all the ordinary risks incident to the situation; his position is that of a volunteer, and is analogous to that of a trespasser or bare licensee; he takes things as he finds them, and, in case of his being injured—unless the injury occurs under such circumstances as to create a liability if he were regarded as a trespasser, intruder, or bare licensee—he cannot recover damages from the master of the servant whom he has volunteered to assist."

In 4 Labatt's Master & Servant (2 Ed.) sec. 1561, it is said:

"In numerous cases the plea set up has been that, at the time of the accident in suit, the injured person was

doing work which he had not been authorized by the defendant or his agent to undertake. If such unauthorized action is established, it is manifest that, in respect to the work thus done, the relation of master and servant did not exist between the person for whom it was done and the person who was doing it, and that the former did not owe to the latter any of those special duties which are deemed to be incidental to that relation. The workman under the supposed circumstance occupies a position which is virtually, if not precisely, that of a trespasser or licensee, and has probably no right of action, except in cases where he has been wantonly injured by the defendant or his servants.''

In 26 Cyc. 1085, it is said: ''The fact that a volunteer was requested or ordered by a servant of the master to give his assistance will not authorize him to recover for personal injuries on the ground that he thereby became a servant of the employer, unless, by reason of his position or the necessities of the case, such servant had authority to make the request.''

In referring to a few of the Missouri cases on this subject, we find that the principles of law announced therein are in full accord with the law as recorded in above text-books.

In Sherman v. Ry. Co., 72 Mo. 62, and following, the plaintiff, a minor, was riding on one of defendant's freight trains without the knowledge or consent of his parents. After riding about ten miles, the brakeman discovered plaintiff, and told the latter he must help set brakes if he wanted to ride. He placed the plaintiff at one of the brakes, and gave him instructions as to how it should be operated. The brakeman finally directed plaintiff to adjust some boards on a car which were falling off. While plaintiff was adjusting said boards, one of them struck a post, threw plaintiff from the train and broke his leg. Hough, J., on pages 65-6, in considering the case, said: ''Whether the company is responsible for the consequence of the brakeman's request to the plaintiff to adjust the loose boards, is the sole ques-

tion to be determined. It is well settled that to make the master liable for the tortious act of his servant the act causing injury must have been in the line of the servant's duty and within the scope of his employment. Here the testimony shows that the brakeman had no control whatever over any person on the train and no concern with them. The testimony is that 'the conductor had exclusive control of the train and of all persons on it.' " A verdict in favor of plaintiff was reversed and the cause remanded.

In O'Donnell v. Railroad, 197 Mo. 1. c. 118, the plaintiff and a companion approached the brakeman on defendant's freight train and asked him to let them ride on said train. He agreed to do so, on condition that they would help unload freight along the route, which they agreed to do, and did, in the presence of the conductor who directed plaintiff where to put the freight. While plaintiff was riding on said train, a wreck occurred through the negligence of the freight train crew, and plaintiff was injured. VALLIANT, J., in disposing of the case, on page 122, said: "Our conclusion is that the plaintiff on this train was a mere trespasser and the railroad company owed him no duty except not to injure him if by the exercise of ordinary care after his peril was discovered the injury could be avoided." Judge VALLIANT held that the conductor was negligent, but there was no room for the application of the humanitarian doctrine, and reversed the case without remanding it.

In Hall v. Railroad, 219 Mo. 553, and following, the plaintiff, an unruly boy, had for some years been in the habit of jumping defendant's freight trains, and in some instances riding from one station to another. On the day of the accident, plaintiff boarded one of defendant's freight trains at Kingsville, Missouri, and went west thereon to Pleasant Hill. The conductor undertook to fix a drawhead in one of the cars and told the boys, including plaintiff, that if they expected to ride, they had better get down and help fix the drawhead, which they did, returned to the flat car on which they had been rid-

ing, and rode to Strasburg. Plaintiff's evidence tended to show that when they arrived at Strasburg, the conductor got off on the ground, and told one of the brakemen to take the boys and do the switching. GRAVES, J., in considering the case, on page 586, said:

"We are of the opinion that the plaintiff was a trespasser and the defendant's liability, if any there be, must be gauged by the care required of it as to trespassers. The evidence shows that there was a conductor in charge of this train, and that neither the conductor nor any other train employee was authorized to employ or direct persons to perform work for the defendant. There is nothing in the record to show any such powers or duties. The act of the brakeman in directing plaintiff to get upon the moving car to set a brake was an act beyond the scope of his authority. [Snyder v. Railroad, 60 Mo. 413; Sherman v. Railroad, 72 Mo. 62; Milton v. Railroad, 193 Mo. l. c. 57.]

"If the direction was without authority it was not such as would make the plaintiff a licensee of the defendant. A license could only be granted by some authorized act of the defendant, or by acquiescence of defendant for a length of time.

"The status of plaintiff being fixed as that of a trespasser the only duty owing to him by the defendant was to use reasonable care not to injure him after he was discovered and known to be in a place of imminent danger or peril."

The judgment in favor of plaintiff was affirmed, on the ground that plaintiff was entitled to have his case submitted to the jury under the humanitarian rule based on the negligence of the brakeman, who had charge of the switching, in failing to protect plaintiff when he saw him in peril and oblivious of the approach of the oncoming cars.

In Shaffer v. Ry. Co., 201 Mo. App. 107 and following, plaintiff got off of the caboose of a freight train in which he had been riding as a passenger and, at the instance of one of defendant's brakemen, undertook to aid

the latter in unloading a barrel of Coca Cola weighing some 450 pounds, from a freight car, onto the platform of the station at Wardell, Misouri, and in so doing, the brakeman failed to support his side of the barrel, letting it slip and fall, catching plaintiff's hand against the car. STURGIS, P. J., in an able opinion, after reviewing the law and facts of the case, on page 116, said: "As the most that is shown here is that the brakeman invited plaintiff to assist in doing this work taking but a moment and that the conductor might have heard and observed it and did not object or protest, there being nothing calling for his doing so, the relationship of master and servant did not exist and defendant cannot be held liable for the brakeman's negligence."

The plaintiff in the case at bar does not claim to have had any conversation with either the assistant superintendent, the conductor of train No. 57, or the station agent at Malden. These witnesses testified positively that they did not know plaintiff prior to his injury; that they had no knowledge that he was assisting the brakeman at Malden in switching or making up said train, on either the day of the accident or prior thereto. It conclusively appears from the testimony of these witnesses that none of the brakemen on said train had any authority whatever to authorize plaintiff to do said switching or making up said train. Under the foregoing authorities, even if the superintendent, conductor and station agent of defendant, had seen plaintiff assisting in said work, and had failed to have him desist, it would not have conferred upon plaintiff the right to maintain this action.

It is contended by respondent's counsel that plaintiff had an interest in the performance of said work, as he was obtaining experience preparatory to getting a job on the Iron Mountain, and that these brakemen had agreed to help him, etc.

The authorities cited in support of this contention are based on entirely different facts from those before us, and have no application to the facts disclosed in this

case. The defendant had no interest in plaintiff's ambition to obtain experience, in order that he might obtain employment on another road. No allegation of this character is set out in the petition, nor was any such issue submitted to the jury in plaintiff's instructions. If plaintiff could have himself placed upon a plain with the employees of defendant under the above circumstances, then every trespasser or tramp, riding upon a freight train, under an agreement with the brakeman, who had no authority to make it, could claim an interest in the proceeding, and hold the company liable for his injury, as it would save him from the necessity of walking. The above contention, on the facts here, is without merit.

The irreparable injury sustained by plaintiff appeals strongly for sympathy in his behalf, but, on the undisputed facts, in the face of the settled law of this State, we have no alternative except to hold that plaintiff, at the time and place of his injury, was either a volunteer, licensee or trespasser, and that defendant owed him no duty, except not to wilfully or wantonly injure him.

The case is devoid of any facts involving the application of the humanitarian rule and, hence, it becomes our duty to reverse the cause without remanding it. It is so ordered. *Higbee, C.,* concurs.

PER CURIAM:—The foregoing opinion of Railey, C., is adopted as the opinion of the court. All of the judges concur.