MYRTLE MENARD, Administratrix of Estate of JOHN MENARD, v. EDWARD F. GOLTRA, Appellant.—40 S. W. (2d) 1053.

Division Two, July 3, 1931.

*Joseph T. Davis* for appellant.

*William H. Schuwerk* and *Chas E. Morrow* for respondent.

WHITE, P. J.—The appeal is from a judgment in favor of the plaintiff for $10,000 damages on account of the death of the plaintiff's husband, caused, it is alleged, by the negligence of the defendant's employees. May 12, 1926, the defendant Goltra was operating on the Mississippi River two barges and a steamer, Minnesota. These barges, the defendant's evidence shows, were each 300 feet in length and forty-eight feet wide, and were loaded, each approximately with 2000 tons of oxide ore, brought from New Orleans. They were side by side at a point called Fort Gage on the Illinois side, where a curve was in the bank of the river, the upstream end of the barges being at the upper end of that curve. The inside barge was a little back of the outside barge; its front end was near or against the river bank, while its rear end was fifty or more feet from the bank, owing to the curve in the bank. They were tied by a line reaching from the front end to a tree on the Illinois shore.

The Minnesota came up the river to Fort Gage May 11 and on the morning of May 12 went a short distance up the river, where a dredge boat was at work. It returned about ten o'clock on the 12th and took a position in the rear of the barges. The evidence tends to show it was fastened to one of the barges or was against the barges. A rope ran from the stern of the inside barge toward the bank and was fastened to a pile which stood in the water about twenty feet from the

bank. The barges had been standing there several days, and it is stated by the appellant that the river had risen during that time. The rope was attached to the pile about eighteen inches under the surface of the water.

John Menard had been employed by the Government to tend the lights on the river. He also conducted a small ferry across the river, by a gasoline motor boat. On the morning of the 12th he with one William Dannish appeared in a small boat or skiff between the barges and the bank and under the direction of someone, it is claimed, in the barges, he attempted to untie the rope which extended from the stern of the barge to the pile and in doing so was thrown from the boat and drowned.

The petition alleges that the rope was loose, "slacked," and Menard, in attempting to untie it from the pile, laid it over and across the skiff, and the employees of the defendant caused a movement of the barge in such way as to tighten the line and pull down upon the small boat or skiff and throw Menard and his companion into the water, causing Menard to be drowned. The petition alleges the following acts of negligence:

That the defendant's agents and employees in charge of the barges permitted the boat (barge) to be moved and the rope drawn tight, causing Menard to be thrown into the water when they knew or by the exercise of ordinary care could have known that if said boat was moved the line would thereby be drawn tight and liable to cause Menard to be drowned; this was repeated in different forms.

That they failed to warn John Menard that they were going to move the boat (barge).

That Menard was in a position of imminent danger of being drowned if the said barge was moved and said rope drawn tight and the slack taken out; and the defendant's agents and servants knew or by the exercise of ordinary care could have known of such imminent peril and negligently caused the boat to be moved.

For answer the defendant first denies the allegations of the petition; then alleges that Menard was not in the employ of the defendant, but was a volunteer and adopted his own method in performing the work he attempted and voluntarily assumed the risk incident thereto and the methods by which he undertook to untie the boat; that the defendant's drowning was caused by his own negligence in that he permitted the rope which was attached to the barge to be over and upon the small boat which he operated and that he negligently and carelessly placed himself in such a position in said small boat as to be thrown overboard; that he negligently and carelessly jumped into the river and undertook to swim without accepting assistance; that if the barge moved causing the rope to become tight it was caused by

the currents of the Mississippi River and the natural flow and shifting of the water therein.

Since the appellant claims that a submissible case was not made out it becomes necessary to state rather fully the facts.

Lester Hodge testified for the plaintiff that he was employed on the Missouri Pacific Railroad track, which ran along the river bank just above where the barges lay. That he saw Menard drowned; that Menard and Dannish were in a boat or skiff about twelve feet long and three and one-half feet wide; that the piling was about twenty feet out from the water edge, and the rope which extended from the piling to the barge was about thirty-five feet long; that he didn't know that he saw the Minnesota move. His evidence was evidently a surprise to plaintiff's counsel, who was permitted to cross-examine him as to what he had told the counsel some days before about the movement of the Minnesota.

Mason Emerson, a student attending a teachers college in Kentucky, testified for the plaintiff. He was working for the Missouri Pacific Railroad Company and saw the accident. He said the skiff was about twelve feet long, but his judgment on that must be considered with his estimate that the barge was about 100 feet long, whereas the defendant's evidence shows that it was 300 feet long. He said Menard and Dannish in their skiff came around the barges. They pulled their small boat under the rope where it went up to the barge, and after getting the skiff directly under the rope they worked it back to the piling where the rope was tied. Then Menard went to work making an effort to untie this rope. He was apparently on his knees, leaning over the side of the skiff, reaching down into the water where the rope was tied. The witness saw three or four white men and seven or eight colored men on the barges and the Minnesota. The white men had on blue caps. He saw one of the men with a blue cap standing on the barge close to Menard and Dannish and heard him call out, "Let her come." He said this to a man up in the little box or cabin up on the Minnesota. Then the Minnesota started upstream. It had the effect of tightening the rope that was over Menard's boat, pulled all the slack out of it and pulled the boat down in the water. Menard hollered, "Stop, you're sinking my boat." Menard and Dannish raised up as the boat was sinking and the water got up somewhere between their knees and waists. Dannish started swimming out, and Menard made an attempt to start, but didn't seem to go far and he went down completely out of sight. That was the last the witness saw of him until he saw his body taken out of the river some two and a half hours later. The witness further said he couldn't tell how far back the Minnesota was from the rear end of the barges, but anyway the Minnesota was tied on to the side of the barges near the back end. On cross-examination he explained

at length, and said he didn't see the skiff take any water at all until the rope was tightened and it was pulled into the water by the force of the tightening rope. That the man on the barge who gave the order for the Minnesota to move forward was standing close to the edge of the barge next to Menard and Dannish on the Illinois side.

William L. Clark, engaged in track work for the Missouri Pacific, testified that he saw Menard and Dannish in the small boat attempt to untie the rope connecting the barge with the shore; the water where Menard was thrown in was deep enough to be over his head; that he heard the mate on the boat tell Menard to release the line. It was a white man with a gang of negroes. This witness was considerably discredited in his cross-examination, where he was made to say that the line which Menard tried to untie was fastened to the *front* end of the barge instead of the rear, where all the other evidence showed it was.

William Dannish, who owned the skiff, was dead at the time of the trial.

The defendant introduced considerable evidence tending to show that the barge did not move; that the Minnesota was not put in motion at all, and that the rope which connected the rear of the barge to the piling was three inches thick, wet and heavy, that its weight was sufficient, with the weight of the two men, to sink the skiff. The captain of the boat, Minnesota, testified to his coming to Fort Gage on the morning of the 12th and he had this to say about Menard:

"I did not know John Menard before the morning that he was drowned. On that morning I had dealings with him. I couldn't say just exactly what time in the morning, but right after we came back from the soundings. Menard had been watching these barges for five days. He came aboard and he came back to the boat where I was and he told me who he was. He told me that he had been taking care of the barges. I told him all right, I was going to take the barges away, and I told him to step in the office, I would settle up with him for taking care of the barges. We went into the office and I asked him what he wanted for taking care of the barges. There was no price set. I hadn't left the barges down there. I hadn't hired him, and no price was set, so I said, 'Well, you haven't done any work on the barges, have you?' He said, 'No. They haven't leaked, or anything. All I done was just watch, and going by up and down to see that they was there all right.' And I says, 'Well, how about a dollar a day will do?' He says, 'That's perfectly satisfactory.' I wrote him out a time check for five days, five dollars, and gave it to him and he put it in his pocket, and when he started out of the office I asked him if he had a skiff, and he said 'Yes,' I says, 'I am waiting for the dredge to signal me to get out of here,' and I asked him if he would kindly let the line go, the stern line, go for

me when he got out there. He said he would. That conversation took place in my office in the boat."

On cross-examination plaintiff's counsel had him identify a report he had made to the Goltra Barge Line on May 13, the day after the accident. That report contained the following:

"——the boat's stern swung out in the river, causing the line to pull down on the stern of the skiff, so it took water. They rushed to the bow of the skiff, causing it to fill with water. Then they both jumped overboard out of the skiff; one of the men swam ashore, but the other man, John Menard, was drowned before help could reach him. . . ."

The captain in his testimony attempted somewhat lamely to explain away that report.

He further testified that on the day of the accident he had on a cap, just an ordinary cap. He was the only white man on the steamboat. There were several negroes there, some of whom had caps on. He gave no order to move the boat forward or release the line. No one had authority to give orders other than himself as long as he was on the boat. No one had any authority to move the boat at all. He didn't see anybody on the barge who gave any orders to anybody to move the boat.

One Milton Blackwell, a witness for the defendant, testified that the mate worked around on the barge and told the fellows, the laborers or deck hands, what to do. "If the mate wants the boat moved he tells them to go and untie the boat." He said that the rope which tied the rear of the barge to the piling was about thirty-five feet long and three inches thick. He was standing on the barge at the time with three other colored fellows. No one else was on the barge. He was watching the men unfasten the rope.

One of the defendant's witnesses, Louis Beckley, testified that the steamer Minnesota hooked on behind the inside barge.

I. The plaintiff pleaded the Illinois "Wrongful Death" statute, which provided in Section 1 that where the death of a person shall be caused by a wrongful act, etc., and if death had not ensued the party injured might have maintained an action and recovered damages, "then and in every such case the person who, or corporation which would have been liable if death had not ensued shall be liable to action for damages, notwithstanding the death of the person injured."

Section 2 of the act provided that suit shall be brought in the name of the personal representative of such deceased person for the benefit of the widow and next of kin, fixing the maximum limit of damages at $10,000 and providing that an action should be commenced within one year after the death. The petition also pleaded a statute of Illinois enacted in 1874 adopting the common law of England as

a part of the law of Illinois. No other law or rule prevailing in Illinois was pleaded in the petition. The defendant in answer pleaded no law of Illinois.

Whether the Illinois Wrongful Death statute creates a new cause of action (17 C. J. 1185-6) or continues or revives a cause of action which already exists (id. 1186; State ex rel. Thomas v. Daues, 314 Mo. 13, 22-23; Proctor v. Hann. & St. Joe. Ry. Co., 64 Mo. 1. c. 120) ; it goes only to the substantive rights and does not affect remedial rights except to provide a year's limitation in which to bring an action, a provision which is not in question here.

Appellant contends that *all* the relevant law of Illinois is made applicable to the case whether such law relates to the substantive rights of the parties or merely goes to the remedies. That brings into consideration the Missouri Act of 1927, now Section 806, Revised Statutes 1929, as follows:

"In every action or proceeding wherein the law of another state of the United States of America is pleaded, the courts of this State shall take judicial notice of the public statutes and judicial decisions of said state."

That statute makes available decisions of another state which are applicable to issues tendered where the law of such other state is pleaded. It does not bring into our courts the procedure of another state. It does not by the mere act of pleading it make applicable the law of another state, but compels judicial notice of such law if pleaded. "In every action or proceeding wherein the law of another state . . . is pleaded," means the law of another state which a party had a right to plead. It means the law of another state which long usage, the observance of a rule applied from time immemorial, makes applicable to a case pending in a jurisdiction different from that where such law is in force. The act does not make applicable to a case any law which was not applicable before. It could not be construed to change the common law rule that the law of the forum controls as to the remedies available to a litigant. In fact it states a rule of procedure. It only saves trouble, volume and circumstantiality in pleading. [Gorman v. St. Louis Merch. Bridge Term. Ry. Co., 325 Mo. 326, 28 S. W. 1. c. 1024.]

This court in Ramey v. Mo. Pac. Ry. Co., 323 Mo. 662, 21 S. W. (2d) 873, quoted the section in full and said that when the statute of another state is pleaded the Legislature meant by the act that such pleading would bring before the court of this State the judicial construction of that statute as interpreted by the courts of the state in which it was enacted. Appellant quotes that passage and evidently approves of it. That interpretation of said Section 806 does not force into the courts of this State judicial notice of all the law of another state pertaining to the issues tendered in a suit

brought here. It means that we shall take judicial notice of all the rulings of another state which pertain to a *law* actually pleaded. If a rule of law or a statute of another state is pleaded by a party to a suit here, we take judicial notice of all the decisions of that other state affecting that particular statute or that particular rule. We are not controlled by decisions or statutes of the other state which might apply to other issues in the same case. We take judicial notice of them, but we do not apply them unless they are applicable as stated before.

The appellant cites a number of Illinois cases which establish the rule that in order to recover for injuries caused by negligence it must be alleged and proved by the party injured that at the time he was injured he was observing ordinary care for his own safety. This is repeated in various forms in a number of cases quoted from Illinois courts. Appellant cites those decisions as if they construe the Wrongful Death Statute under which this suit was brought. They do nothing of the kind. They announce a general rule of negligence which prevailed from the earliest reported cases in Illinois. It was a general rule applicable to all negligence cases before the Wrongful Death Statute was enacted. Therefore we do not take judicial notice of those decisions because they do not construe the statute under which the suit was brought, and because the defendant does not plead that rule.

Further such decisions of the Illinois courts would not be applicable here if they were pleaded. They relate merely to matters of procedure: to the remedies which are afforded a party injured, and a party defending against a suit for injuries.

The rules of evidence are a part of the law of the remedy and the law of the forum controls. It controls as to the burden of proof, the competency of witnesses and the weight of the evidence.

"The application of a rule of evidence created by statute to the trial of a cause of action arising in another state, or to the trial of an action between parties who are non-residents, does not operate to give the statute an extra-territorial effect." [12 C. J. 486; State of Kansas ex rel. v. U. S. Fidelity & Guaranty Co., 322 Mo. 1. c, 135.] In the case cited passages from Corpus Juris are quoted. The general rule is that as to the matter relating to procedure, the *lex fori* governs, including the question of succession to rights of action, with one exception, in cases of purely statutory actions wherein the right to sue is prescribed as an essential of the cause of action. That would take the Wrongful Death Statute of Illinois out of the category of remedies and class it as one of substantive rights. [12 C. J. 485.]

The rule which appellant invokes is not a construction of that statute, nor does it affect the substantive rights of the parties. For

that matter the contributory negligence of a party injured defeats recovery in Missouri as well as in Illinois, unless the Illinois rule goes so far as to preclude recovery where the suing plaintiff was negligent whether or not such negligence contributed in any degree to his injury. Under the Missouri rule an injured plaintiff may recover although negligent unless his negligence had something to do with causing the injury. If the Illinois rule did vary to that extent from our rule it would not be available to the defendant because not pleaded.

Therefore, for two reasons we cannot apply the rule announced in the Illinois cases quoted by appellant; because such rule of law is not pleaded, and because it applies only to the remedial rights of the parties and not to their substantive rights. The rule in this State, applies—that plaintiff's negligence which contributed to his injury is an affirmative defense which must be pleaded and proved in order to be available to a defendant.

II. Appellant makes the point that the relation of master and servant between Menard and the defendant was not pleaded and that the plaintiff could not plead it because he elected to proceed under the Wrongful Death Statute of Illinois and not under the Workmen's Compensation Act. We fail to understand why the plaintiff would have been compelled to proceed under the Workmen's Compensation Act if the relation of master and servant existed. We are not apprised that any Workmen's Compensation Act of Missouri would apply to this case where the cause of action accrued in Illinois or how the relation of the parties is such as to come within the jurisdiction of the Missouri Workmen's Compensation Act. There is nothing in the Illinois statute under which this suit is brought to prevent recovery by the administrator of a servant against a master for a death occurring in the manner alleged here. On the contrary the Illinois statute covers every case where the death of a person shall be caused by a wrongful act, neglect or default.

The appellant argues at length that Menard was a mere volunteer, that no one directed him to untie this rope which would release the barge, that he therefore assumed the risk and the defendant owed him no duty which a master owes to a servant performing a service ordered by the master.

There was evidence for the plaintiff upon this point. It was testified that someone on the barge or on the Minnesota directed Menard to untie the rope; someone wearing a cap. One witness said it was the mate. Some of defendant's evidence tended to show that only one white man was on the barge and he wore a cap. Appellant, however, overlooks the significant testimony of the captain of

the Minnesota who said that he was the only one who had authority to give orders. When he brought the Minnesota up to the rear of the barges he says Menard had been watching those barges for five days. No price had been set for that service; the captain himself hadn't left the barges there and for that reason he hadn't hired Menard. The captain wrote a check for five dollars to pay him for the service. The acceptance and acknowledgment of that service and paying for it by the captain, the officer in authority, were circumstances from which the jury might infer that Menard was employed. Dannish was dead and plaintiff had no living witness to prove the employment. If such employment was not formally made Menard's function as a servant of the defendant was ratified by that act of the captain. He nowhere intimates that Menard was not employed. He indicates the contrary. Menard had been "taking care of the barges." No hint that such was a voluntary accommodation.

Did that service end when Menard got his money and started out? Before he left the office with his check the captain asked him if he had a skiff and if he would kindly let go the stern line when he got out there. "He said he would." Was that a continuation of the services which Menard was performing for the company? Or was it merely a volunteer service? He went to release that line at the request, the direction, of the captain of the Minnesota, the only person to give orders concerning the movement of the Minnesota or the barges. It doesn't matter whether he was then a servant or whether this was a gratuitous service rendered at the instance of the captain; reasonable care was due him while performing it.

The appellant cites Oatmen v. St. Louis S. W. Ry. Co., 304 Mo. 38, l. c. 53 et seq., where numerous cases are cited, holding that where a volunteer attempts to perform some service for a person or a corporation and is injured he cannot recover for the injury, although it was caused by the negligence of the party to whom the service was rendered. In each instance cited there was either no employment at all or there was a request to perform such service by some person who had no authority to make the request. A passage from Cyc., now 39 Corpus Juris, 269, is quoted as follows:

"The fact that a volunteer was requested or ordered by a servant of the master to give his assistance will not authorize him to recover for personal injuries on the ground that he thereby became a servant of the employer, *unless, by reason of his position or the necessities of the case, such servant had authority to make the request.*"

It is not contended here that the captain did not have authority to make the request, or to order, Menard to untie the rope from the piling. On the contrary he asserted that he was the only one with authority to give such an order. Menard, therefore, even if he were not a servant but a volunteer, was placed squarely within the ex-

ception to the rule. He was requested to perform a service by the employee of the defendant who had authority to make such request. It was a necessary service which only Menard and Dannish were equipped to perform, having their skiff.

III. We come then to the alleged error of the court in failing to sustain a demurrer to the evidence at the close of the case. The main reasons why that is claimed to be error has been answered in what is considered in Paragraph I above. On the facts the appellant argues that the two men in the skiff were a sufficient load for it, and that the added three-inch rope, thirty-five feet or more long and wet, when laid across the bow of the boat, was sufficient to sink it. There was no evidence as to the weight of that rope. As a matter of common knowledge it would weigh more wet than it would dry, but we have no information, from common knowledge or otherwise, that such a rope would be so heavy that a man could not handle it, carry it on his arm, although wet and thirty-five feet long. There was no evidence of what load the skiff would carry. It is a matter of common knowledge, among fishermen that boats like this, even as small as some of the witnesses described it, twelve or fifteen feet long and three and one-half feet wide, will hold up very much more than the weight of two men. The evidence for the plaintiff tended to show that the weight of the rope across the bow of the boat did not sink it. On the contrary the boat was thrust under the rope and the rope gathered up from the water as the men worked from the side of the barge towards the piling. Even after they got to the piling, the rope drawn upward and across the bow didn't have the effect of sinking it. It was only while Menard was bending down on the side of the boat, reaching and trying to untie the rope from around the piling eighteen inches below the water surface, that the trouble began. There was sufficient evidence tending to show that the barge moved, that it was moved by the pressure of the Minnesota at the rear; that that motion tightened the rope and caused it to straighten across the bow of the boat and bring it under the water. The jury could well find that the Minnesota moved, shoving the barge upstream or outward, and, as the captain said in his report, tightened the rope; that this movement was caused by an order from someone directed to those controlling its movements. Whether that order was made by the captain who had authority to make it or by someone who had no authority is immaterial. It was the duty of the defendant under the circumstances, the captain himself being on the boat and knowing that Menard was engaged in the perilous operation of loosening the line from that pile, to see that there was no movement by the Minnesota which would affect the barge and further imperil the man

who was at work. There was sufficient evidence to make a submissible case on that issue. Appellant argues that there was a current in the river at that point which caused the movement, if there was one, of the barge. There was no evidence that a current ran along the bank where the line ran across from the rear of the barge to the pile. On the contrary there was evidence that there was an eddy in the curve of the bank. The little boat did not sink nor drift away, but floated there in the eddy.

IV. It is further claimed by appellant that the deceased Menard chose an unsafe way to perform the work when a safe way was apparent. He chose to put the rope across the small boat—a dangerous way. There is no evidence that he could have managed it in another way, but it is argued that he could have rowed to the pile which stood twelve feet out of the water and could have made his boat secure before attempting to untie the rope. Perhaps he could. But there is ample evidence that the method chosen was not necessarily dangerous if the barge stood still. It was for the jury to say whether the men in the skiff were negligent in choosing the method they did or that it was not a practical method to accomplish the result desired.

It is further argued that when the water began to come into the boat Menard should have stayed with it instead of jumping off. It is pointed out that the small boat didn't sink, that it turned over and partly filed with water and still remained afloat. There is evidence to show that Menard didn't jump out of the boat but was thrown out. Dannish jumped out or was thrown out and swam to the shore. Menard either jumped out or was thrown out and attempted to swim, but sank and drowned. The rule is universal that where an emergency of that kind exists in the excitement, where sudden action is required, a party in such situation is not negligent in failing to take a more safe course. Acting upon the spur of the moment he hasn't time to deliberate upon such movement. That would apply here unless Menard was conclusively negligent in putting the rope across the boat, a question for the jury.

V. Appellant cites an Illinois case to the effect that the humanitarian rule does not apply in Illinois and that a submission on that theory was erroneous. Such Illinois rule was not pleaded and is not before us for consideration. Menard was plainly in a position of peril, if the barge should move. He was unconscious of any intention to move it. He had a right to assume that it would not be moved and so imperil him. If he was negligent in that assumption, the evidence is sufficient from which the jury could find that the men operating the

Minnesota and in charge of the barge knew that he was in that position and caused the movement which precipitated him into the water notwithstanding such knowledge.

From all the evidence the jury was justified in finding the negligence of the defendant alleged and that Menard was not negligent in any degree which would defeat recovery.

VI. Appellant contends that the verdict should be set aside because of prejudice and sympathy on the part of the jury created by incompetent, prejudicial evidence. He mentions several passages from the testimony of plaintiff's witnesses of which he complains. In nearly every instance no objection was made at the time and in some instances objection was, "I object to that," without specification as to why the evidence was incompetent.

One Victor Clovis, witness for the plaintiff, was asked to describe the condition of Menard's clothing when he was taken from the water, the condition of his sleeves. That was objected to as irrelevant and immaterial. The answer was that the sleeves were rolled up. That was to corroborate other evidence to show that Menard had his sleeves rolled up when he was attempting to untie the boat. It was relevant and not harmful. As to the rest defendant made no sufficient objection to such evidence which he claims produced prejudice in the minds of the jury, and he cannot now complain about its being improperly admitted.

VII. It is claimed that the testimony of Myrtle Menard, widow of the deceased, was incompetent and should have been stricken out—primarily as to the earnings of John Menard. She testified:

"He got $80 a month from the Government for tending the lights. He made about $65 a month out of the ferry. The ferry consisted of crossing passengers. He operated a gasoline boat."

She then said that her husband had ordinary good health. That he had sick spells, but that he was in good health at the time, that her oldest son was twenty-three years old and the youngest one fourteen years. This was on cross-examination. She was cross-examined at length by defendant's attorney as to how she knew how much her husband made out of the ferry. She said he kept books and those books were at home. Then after that cross-examination defendant's counsel moved to strike out all her testimony with reference to the earnings. The motion was properly overruled. The defendant after hearing her testimony without objection that he earned "about $65 a month" and after cross-examining her at length and failing to develop what he hoped might come from the cross-

examination, then moved to strike out the testimony. His motion came too late.

She also testified that William Dannish at the time was dead—had been dead about a year. That was objected to as immaterial and irrelevant. We cannot see and counsel does not explain why this evidence was harmful. It would have been harmful to plaintiff to leave the jury uninformed as why Dannish did not testify. The only harm to defendant was to deprive him of an inference harmful to plaintiff.

VIII. It is further claimed that the verdict for $10,000 is excessive, for one reason because there was no definite evidence of the earnings of John Menard. The evidence was sufficiently definite. The widow testified without objection that he got $80 per month from the Government for tending the lights, and made about $65 a month with his ferry. Naturally the ferry earnings would vary some from time to time. There was no objection at the time to the indefiniteness of that statement. Mrs. Menard explained how he kept books, how he brought the money in. She said she knew how much he brought home each day without knowing what the books showed. This would make the earnings of Menard more than $1600 a year. He was forty-four years of age. His earnings would amount to as much as the verdict in about six years. There was no objection for failure to show what portion of his earnings were directed to his family. The life expectancy of the widow, who was forty-eight years of age, was much greater than that.

IX. It is claimed the court erred in instruction numbered 5 given for plaintiff on the measure of damages. It directed the jury that if they found for plaintiff in awarding damages to the administratrix "you should find in such sum not exceeding $10,-000 as in your judgment from all the evidence will be fair and just compensation to the next of kin of John Menard, deceased, for the pecuniary loss, if any, resulting to them by reason of his death." The pecuniary loss would be all that part of his earnings which he would contribute to the support of those dependent upon him. Appellant points out that one son was over the age of twenty-one years, while one was fourteen years of age, and claims the instruction should have pointed out who were dependent upon Menard and entitled to that compensation. The instruction is in the language of the statute. The defendant neither pleaded nor cited any decision of the Illinois courts construing the statute in relation to the measure of damages, or defining "next of kin." Whatever pecuniary loss occurred was to the widow

and next of kin dependent upon Menard for support, whether one or many. Since the defendant offered no instruction defining more particularly for whose benefit the judgment would result he is not in a position to complain.

Appellant claims there was error in refusing his Instruction No. 7, which told the jury that if they should find Menard used the skiff described in the evidence, under his control, and adopted his own method of performing said work, then they would find that Menard assumed the risk as to the methods and manner of doing said work, and if they found that in that method Menard "did not exercise due care and caution for his own safety" the plaintiff was not entitled to recover and the verdict should be for the defendant. Thus the jury were told that if Menard did not exercise due care for his own safety plaintiff could not recover, whether that lack of care had anything to do with causing his death or not. That is not the law in this State. Contributory negligence in order to defeat recovery must contribute. [Monroe v. C. & A. Railroad Co., 280 Mo. l. c. 489; Bobos v. Krey Packing Co., 317 Mo. l. c. 117-18.] Therefore the instruction was properly refused.

Error is assigned to the refusal of Instruction 9 offered by the defendant. That instruction told the jury that while one acts suddenly in the face of imminent danger he was not required to act with the same care as if he had full opportunity, but the rule was not applicable where one's contributory negligence led him into the emergency; therefore if they should find that Menard was confronted with an emergency and his boat was submerged through his contributory negligence and if they believed Menard would not have been drowned if he had remained with said skiff, line or piling, then he was not entitled to recover. This instruction does not take into consideration the humanitarian rule. There was sufficient evidence to show that Menard was in a position of peril in untying the line with the boat under the line, not necessarily perilous if the barge should remain stationary according to the plaintiff's evidence, but certainly perilous if the defendant should move the barge. The evidence further shows that the defendant's agents in charge of the boat Minnesota and the barges knew of his position and notwithstanding permitted the barge to move. The humanitarian doctrine applies in such cases. The court gave instructions numbered 1, 2 and 3 for the defendant which fairly covered the defendant's theory of the case.

X. Appellant makes the further point that his motion for a new trial should have been sustained on the ground that it shows newly

discovered evidence which would authorize a new trial. The motion is accompanied by appellant's affidavit, signed but not sworn to, asserting that the newly discovered evidence would have been produced by Captain Martin, Chief Engineer Schrode and one John C. Greenwell. Captain Martin in fact did testify, and Schrode was not present but his affidavit as to what he would swear to was read to the jury, being attached to the motion for continuance which was overruled. One reason why the testimony of Captain Martin was alleged to be important was that after the suit was brought and before the trial there was litigation regarding the ownership of the barges and they were turned over to the Mississippi River War Service of the Government and the officers and employees of that service went to various parts of the Mississippi River in their avocations and as a result the defendant was unable to discuss the facts in said cause with Captain Martin and during that eighteen months which elapsed between the filing of the suit and the trial Captain Martin had no opportunity to refresh his memory. No diligence was shown.

Besides, the important fact which Martin failed to testify to related to a signal given by the government dredge at eleven A. M. on the day of the accident, and the subsequent movements of the Minnesota before the accident. It is not explained how the previous movements of the Minnesota had anything to do with the exact facts attending the incident. The unsworn affidavit further says that Captain Martin would testify that the barges in the position they were occupying against the bank could not move forward on that account—that it was physically impossible. That one Captain Kennedy, who had had many years of experience on the Mississippi River, would testify that all boats and barges tied as the steamer Minnesota and the barges in question were, would naturally move from side to side, due to the movement of the current. The affidavit does not say what Greenwell was expected to swear to.

It continues thus: "Your affiant further states that his defense cannot be properly and adequately presented without such testimony and that unless he is granted a new trial herein he will be deprived of a fair and impartial trial and that such newly discovered evidence will cause the jury to determine issues for the defendant." To the motion is also appended the affidavit of Captain Meadows who says that he saw the position of the Minnesota and the two barges and that the nose of the Minnesota was tied to the stern of the outside barge and it would have been physically impossible for the barges to move forward because of their position against the bank. The affidavit of Schrode as to what he would testify to was the same as that read to the jury on the application for a continuance.

As to whether this newly discovered evidence was cumulative we

refer to the appellant's brief where he says the defendant produced nine or ten witnesses as against two witnesses produced by plaintiff and those nine or ten witnesses "testified definitely and positively that there were no orders given by the mate or any one else for the boat to move forward and also testified the boat did not move of its own power, but some testified that the barges and boat may have moved a little in and out due to the currents of the water in the river. . . ." Among these witnesses was the chief engineer who was then on duty in charge of the engine and power plant of the steamer Minnesota whose affidavit was read in evidence. The oilers, firemen and water tenders of the engine room testified. They all testified unequivocally and positively that no order had been given to move the boat forward or in any direction, that no such signals were given; that the power was not on and that the steamer did not move as the result of any power or action of any servant, agent or employee of the defendant; that it was impossible to move the boat and barges forward without shoving the bank in because "the nose of the inside barge was against the bank." Yet appellant now claims that he was deprived of a fair trial because he did not have witnesses to prove those facts which his nine or ten witnesses swore to, nearly all of them experienced river men, including the captain of the Minnesota who knew, if anybody did, all about it. The motion presented no ground for a new trial.

The judgment is affirmed. All concur.